ESTATE OF MARGARET D. LOVE, DECEASED, ANNE LOVE HALL AND STANARD T. KLINEFELTER, CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Love v. Commissioner
Docket No. 5648-87
United States Tax Court
T.C. Memo 1989-470; 1989 Tax Ct. Memo LEXIS 470; 57 T.C.M. (CCH) 1479; T.C.M. (RIA) 89470; August 30, 1989
Stanard T. Klinefelter, for the petitioner. Kim A. Palmerino and John F. Dean, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioner's Federal estate tax of $ 136,193.32. After concessions, the following issues remain for decision: (1) the value of two thoroughbred horses to be included in petitioner's gross estate, (2) whether $ 147,000 paid by petitioner pursuant to a "foal-sharing agreement" may be deducted as an administration expense, and (3) whether petitioner may deduct as administration expenses or claims against the estate stud fees in the amount of $ 13,558.87 that were previously deducted on petitioner's Federal income tax return. *473 FINDINGS OF FACT Certain facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Margaret D. Love ("Mrs. Love") died on March 22, 1983. She was a resident of Maryland. Her will was probated in the Orphans' Court of Baltimore County, Maryland. The co-executors of her estate are Anne Love Hall, who is her daughter, and Stanard T. Klinefelter. At the time of her death, Mrs. Love was in the business of breeding and racing thoroughbred horses. Mrs. Love boarded a number of horses in Normandy, France. Among the issues in the instant case are the values of two of those horses on the applicable valuation date. The first horse, named Praise, is a broodmare (a female horse held for breeding). Praise was born in 1975 and experienced moderate success in racing. Eleven days prior to Mrs. Love's death, Praise was mated with a highly regarded stallion named Persepolis. On the date of Mrs. Love's death, it was not feasibly possible to ascertain whether Praise had become pregnant as a result of the mating. Praise had, however, conceived a foal in each of three previous years. On April 23, 1983, one month *474 after Mrs. Love's death, a veterinary examination disclosed that Praise was pregnant ("in foal"). Horse breeding begins in mid-February and continues into June of each year. Thus, thoroughbred sales infrequently occur during that period. In Europe, approximately 90 percent of thoroughbred sales occur at public auctions held late in the year, from the first of November to mid-December. During that time, the most important public auctions in Europe take place at Deauville, France and Newmarket, England. Mrs. Love's will directed that her operations in France be liquidated. In December 1983, petitioner sold Praise at the Deauville auction for $ 328,000 (net of sales commission). That sale took place at the highest price for which a broodmare had been sold at public auction in France from 1979 to 1983. At the time of its sale, Praise had been in foal for nine months. A horse's gestation period is 11 months. The average price of the horses sold at the December 1983 auction at Deauville was 43 percent higher than the average price of the horses sold at the December 1982 auction at Deauville. The average price of the ten most expensive broodmares sold at the December 1983 Deauville *475 auction was 78 percent higher than the average price of the ten most expensive broodmares sold a year earlier. The second horse we must value is one of Praise's offspring, a foal whose sire was Shergar. Shergar's foal (the "Shergar foal") was three weeks old on the date of Mrs. Love's death. Shergar had been an exceptional racehorse, and the racing community had high expectations for Shergar as a stud. In February 1983, however, Shergar was stolen in Ireland. By July 1983, hope of recovering Shergar was lost. At the date of Mrs. Love's death, the Shergar foal had weak front legs. The Shergar foal was therefore confined to a stall for the first six weeks of her life. Such confinement is, however, unusual. The Shergar foal's condition improved after Mrs. Love's death, and in July 1983, petitioner sold the horse in a private sale for $ 285,000 (net of sales commission). That price surpassed the previous record price in Europe for a horse of similar age (a weanling). Focusing upon the administration expense issue, Mrs. Love owned another broodmare named Dunette. On January 6, 1983, Mrs. Love entered into a written agreement to have Dunette mated with Golden Fleece, a stallion *476 with an impressive race record. Under the terms of the agreement, Coolmore Stud, the owner of Golden Fleece, was entitled to no stud fee, but would acquire a ownership interest in any foal produced by the mating (the "shared foal"). Agreements containing such provisions are known as "foal-sharing" contracts or agreements. Mrs. Love and Coolmore Stud agreed to sell the shared foal at public sale once it became a yearling (one-year old). The agreement also allocated responsibility for certain costs such as Dunette's transportation to Coolmore Stud's farm in Ireland, maintenance of Dunette and the shared foal, and costs of selling the shared foal when it became a yearling. Finally, the agreement contained the following clause: In the case of major difficulties (bankruptcy, death) causing the impregnated mare to be sold, Mrs. H.A. Love is obligated to pay Coolmore the amount of 115,000 Irish pounds (one hundred fifteen thousand). [1]
Industry standards require *477 that a broodmare sold at public auction be free of any liens or encumbrances. Prior to Mrs. Love's death, Dunette and Golden Fleece mated several times. Dunette was not successfully "covered" (impregnated), however, until April 6, 1983. In September 1983, petitioner paid Coolmore Stud 115,000 Irish pounds. The parties have stipulated that the payment equaled $ 147,000. In late November 1983, petitioner sold Dunette at public auction in Newmarket, England. She was approximately eight months in foal at the time. Focusing upon the stud fees, on November 24, 1982, Mrs. Love had entered into another type of breeding agreement. That agreement required that Mrs. Love pay the owner of Persepolis 65,000 French francs and an additional 65,000 French francs on October 1, 1983, if Praise were then pregnant. On December 8, 1982, Mrs. Love entered into a breeding agreement similar to the November 24, 1982, agreement. She agreed to have her broodmare, La Girouette, mate with a stallion named Vayrann. That agreement required that Mrs. Love pay 40,000 French francs on July 1, 1983, and an additional 40,000 French francs on October 1, 1983, if La Girouette were then pregnant. The parties *478 have stipulated that petitioner made the initial payments due under both the Persepolis and Vayrann breeding agreements and that the total value of these payments was $ 13,558.87. OPINION Value of Praise and the Shergar Foal
We must first decide the value of Praise and the Shergar foal to be included in petitioner's gross estate. Section 2031(a) [2] provides as follows: (a) General. -- The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated. Section 2033 brings within the gross estate the value of all property in which the decedent had an interest at the time of death. Mrs. Love owned both Praise and the Shergar foal at the time of her death. Thus, section 2031(a) requires that the values of both horses at the time of Mrs. Love's death [3] be included in the gross estate. *479 The regulations provide additional guidance in valuing property for Federal estate tax purposes. Section 20.2031-1(b), Estate Tax Regs., provides in pertinent part: (b) Valuation of property in general. The value of every item of property includable in the decedent's gross estate under section 2031 through 2044 is its fair market value at the time of the decedent's death, * * *. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * Attached to the Federal estate tax return filed by the co-executors is an appraisal by Elie de Brignac which values Praise at $ 80,000 and the Shergar foal at $ 150,000 at the time of Mrs. Love's death. Mr. de Brignac died prior to trial, and petitioner obtained the services of another expert. The report of petitioner's expert at trial values Praise at $ 108,000 at the time of Mrs. Love's death, while the Shergar foal is again valued at $ 150,000. The report of respondent's expert, on the other hand, values Praise at $ 224,220 and the Shergar foal at $ 214,000. *480 The issue of fair market value is one of fact, and petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a); Estate of Gilford, 88 T.C. 38, 50-51 (1987). Although none of the reports appears acceptable in all respects, we find the approach of petitioner's expert at trial more reliable under the facts and circumstances of this case and find that the fair market values of Praise and the Shergar foal on the applicable valuation date were $ 116,000 and $ 150,000, respectively. Respondent's expert valued Praise by taking her sale price in December 1983, i.e., $ 328,000, and subtracting what he viewed as appreciation occurring after Mrs. Love's death. He first subtracted $ 25,000 on the theory that Praise's fetus would have increased in value by this amount between the date of Mrs. Love's death and the sale date. He also subtracted $ 78,780 on the theory that 26 percent of the remainder of the sale price, i.e., $ 303,000, reflected market inflation occurring after the date of Mrs. Love's death. He arrived at 26 percent by pro rating a 35 percent increase in the average sale price at Deauville from December 1982 to December *481 1983. Although the actual increase was 43 percent, respondent's expert attributed 8 percent of the actual increase to the fact that the December 1983 auction offered better quality horses. We perceive a fundamental problem with the foregoing analysis. Respondent's expert begins his analysis with a sale price obtained some nine months after the applicable valuation date. In a recent case, we stated the following respecting the weight to be given post-death sales of property to be included in the gross estate: While subsequent events are generally not relevant in fixing a property's fair market value on a given date, the price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value * * * except where a material change in circumstances occurs between the valuation date (herein the date of decedent's death) and the date of sale which renders the subsequent sale unforeseeable. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1233 (1987) (Emphasis supplied; citations omitted.); accord Estate of Gilford v. Commissioner, supra at 52-55 (Post-death merger price of stock disregarded *482 in valuation because price not foreseeable at time of death.). In the instant case, we find that circumstances changed materially after Mrs. Love's death. First, the market for thoroughbred horses experienced significant inflation from December 1982 to December 1983 (43 percent according to the parties' stipulation). Some of that inflation may have occurred before Mrs. Love's death, with the remainder occurring after her death. Respondent's expert, however, prorates the inflation, without explaining why such proration is appropriate. We thus reject his methodology for disregarding post-death inflation. Georgia Ketteman Trust v. Commissioner, 86 T.C. 91, 101 (1986). Second, after Mrs. Love's death, Praise was determined to be in foal. Surely, this increased her value considerably. Respondent's expert assumed for the purpose of his valuation that Praise was pregnant at the date of Mrs. Love's death, although it was impossible to ascertain pregnancy on that date. A hypothetical willing buyer would not have been aware that Praise was in foal. The report of respondent's expert, therefore, contravenes the regulations by making use of hindsight. Sec. 20.2031-1(b), *483 Estate Tax Regs. ("All relevant facts and elements of value as of the applicable valuation date shall be considered in every case.") (Emphasis supplied.) Respondent's expert valued the Shergar foal in much the same manner that he valued Praise. He began with the July 1983 sale price of $ 300,000 [4] and subtracted what he viewed as post-death appreciation. He again prorated the inflation in the market from December 1982 to December 1983 and subtracted $ 36,000 as post-death inflation. He subtracted another $ 50,000 to reflect events occurring after Mrs. Love's death which he believed increased the Shergar foal's value. Those factors included improvement of the horse's weak legs, increased age, and the presumed death of its formidable sire, Shergar (the death limited the number of potential Shergar foals). Again, we are not convinced that any portion of the market inflation occurred prior to Mrs. Love's death, and we are unwilling to quantify the effects of various post death events on the Shergar foal's sale price. We accordingly *484 reject the approach adopted by respondent's expert. The report of petitioner's expert at trial values Praise by positing that on the date of death she was worth $ 80,000 without foal and $ 130,000 in foal. The report then multiplies the resulting $ 50,000 difference by 80 percent in order to reflect the fact that no one could have ascertained with certainty whether or not Praise was pregnant on the date of death. The resulting $ 40,000 is then added to the $ 80,000 without foal value to arrive at a tentative valuation of $ 120,000. The report then further discounts this value by 10 percent in order to reflect the possibility of miscarriage. The resulting value is $ 108,000. We need not adopt in full the opinion of any expert. Chiu v. Commissioner, 84 T.C. 722, 734 (1985). We adopt, however, all but the final step of the foregoing analysis. We think that the possibility of miscarriage should impact only the value of the potential foal, not the broodmare. Thus, applying a 10 percent discount to the $ 40,000 tentative value attributed to the potential foal, we arrive at $ 36,000 as the value of the potential foal. Adding that amount to Praise's value without foal, *485 i.e., $ 80,000, we value Praise at $ 116,000. We also adopt the $ 150,000 value given the Shergar foal by petitioner's expert at trial. His values for both horses stem from comparable sales in December 1982. The comparable sales are a more reliable indicator of values on the date of death than the subsequent sales relied upon by respondent's expert. The $ 147,000 Payment
We must next decide whether petitioner may deduct as an administration expense the $ 147,000 paid to Coolmore Stud pursuant to the foal-sharing agreement. Petitioner argues that the payment constitutes a deductible administration expense under section 2053(a)(2). Respondent argues that the expenditure is capital in nature and therefore nondeductible under section 20.2053-3(d)(1), Estate Tax Regs. Petitioner bears the burden of proving deductibility. Rule 142(a). We hold that the payment constitutes a nondeductible outlay for an addition to the estate. The regulations define deductible administration expenses as follows: The amounts deductible from a decedent's gross estate as "administration expenses" * * * are limited to such expenses as are actually and necessarily incurred in the administration *486 of the decedent's estate; that is, in the collection of assets, payment of debts, and distribution of property to the persons entitled to it. * * * Sec. 20.2053-3(a), Estate Tax Regs. Although miscellaneous expenses such as those for "preserving and caring" for property may be deducted, the regulations expressly prohibit any deduction for "outlays for additions or improvements." Sec. 20.2053-3(d)(1), Estate Tax Regs. Given Mrs. Love's direction that her horses in France be sold and the difficulty of selling a broodmare subject to a foal-sharing agreement, we agree that the $ 147,000 payment was necessary to the administration of the probate estate. We nevertheless disallow deduction of the payment because it did not constitute an "expense" of administration. The agreement to have Dunette mated with Golden Fleece expressly stated that no stud fee would be charged. Thus, we dismiss petitioner's argument that the payment constituted a stud fee, without expressing an opinion as to whether a stud fee payment would be deductible under section 2053(a)(2). In lieu of a stud fee, the agreement gave Coolmore Stud, Golden Fleece's owner, a one-half interest in the shared foal produced *487 by the mating. The parties contemplated that the shared foal would be sold after attaining one year of age and that the sale proceeds would be divided. The parties also foresaw the possibility that some contingency would force a sale of Dunette while pregnant. They agreed that in such event, Mrs. Love, or her representatives, would "buy-out" Coolmore Stud's interest in the fetus, because the race horse industry generally does not permit public sales of pregnant broodmares encumbered by foal-sharing agreements. Mrs. Love's death on March 22, 1983, required that Dunette be sold while pregnant. Petitioner, consequently, paid Coolmore Stud $ 147,000 for Coolmore Stud's interest in the fetus. The payment is no more an "expense" than would be a payment for a new horse or some other asset acquired by the probate estate. Payments for additions to the probate estate do not qualify as administration expenses. Sec. 20.2053-3(d)(1), Estate Tax Regs.; Estate of Hammon v. Commissioner, 10 B.T.A. 43, 51 (1928); compare Estate of Papson v. Commissioner, 73 T.C. 290, 299-300 (1979) (Payment of commission to acquire lease for commercial real property not an addition *488 or improvement.). A one-half interest in the fetus constituted an addition to the estate. We therefore disallow deduction of the payment for that interest. Moreover, in applying section 2053(a)(2) we should not lose sight of its purpose. The purpose of the deductions authorized by section 2053(a) is to ensure that only the "net estate," i.e., that which is available for distribution to beneficiaries, is taxed. Knowlton v. Moore, 178 U.S. 41, 56 (1900); Hibernia Bank v. United States, 581 F.2d 741, 746 (9th Cir. 1978); Jacobs v. Commissioner, 34 B.T.A. 594, 597 (1936). [5] When cash held by an estate is merely converted to some other form of asset, the size of the disposable estate is unaffected. Payment of the $ 147,000 did not affect the value of the gross estate. An additional one-half interest in Dunette's foal was substituted for $ 147,000 in cash or some other liquid asset. No sound reason, therefore, exists for permitting a deduction from the gross estate. [6]
*489 Stud Fees
Finally, we must decide whether stud fees totalling $ 13,558.87 may be deducted from the gross estate as either administration expenses or claims against the estate. The $ 13,558.87 figure consists of 65,000 French francs paid to have Praise covered by Persepolis and 40,000 French francs paid to have Mrs. Love's broodmare La Girouette covered by the stallion Vayrann. The parties have stipulated that the two payments valued $ 13,558.87. Respondent argues that petitioner may not deduct the stud fees from the gross estate because petitioner has earlier deducted the same fees on a Federal income tax return. Respondent cites section 642(g) as setting forth a rule against "double deductions." [7] Petitioner, on the other hand, responds by arguing that the deductions should be permitted as "deductions in respect of a decedent" under section 691(b), which are expressly exempted from section 642(g)'s prohibition. Sec. 1.642(g)-2, Income Tax Regs.
Both parties *490 have misconstrued section 642(g). By its express terms, the statute is inapplicable in the instant case. In pertinent part, the statute provides: (g) Disallowance of Double Deductions. -- Amounts allowable under section 2053 or 2054 as a deduction in computing the taxable estate of a decedent shall not be allowed as a deduction * * * in computing the taxable income of the estate * * * unless there is filed * * * a statement that the amounts have not been allowed as deductions under section 2053 or 2054 and a waiver of the right to have such amounts allowed at any time as deductions under section 2053 or 2054. (Emphasis supplied.) By its express terms, the statute prohibits deductions against income unless certain conditions are satisfied. In the instant case, however, we must decide whether certain items are deductible against the gross estate. Although respondent's rulings are not precedential, Follender v. Commissioner, 89 T.C. 943, 958 (1987), we note that respondent's own published position is that section 642(g) does not disallow estate tax deductions. In Revenue Ruling 81-287, 1981-2 C.B. 183, 184, respondent stated, *491 Section 642(g) of the Code denies a deduction for income tax purposes if the same deduction is allowed as a deduction for estate tax purposes. However, there is no basis to deny a deduction for estate tax purposes if the waiver statement under section 642(g) has not been filed. [Citation omitted.] Respondent's ruling cites as authority Estate of Baldwin, T.C. Memo. 1959-203. In that case, respondent argued, as here, that a taxpayer's earlier deduction of an item on an income tax return prevented its deduction from the gross estate. We rejected the argument and construed the predecessor of section 642(g) as follows: Section 162(e) of the Internal Revenue Code of 1939 indeed shows an intent on the part of Congress to prevent double deductions, as between the income and estate taxes. But that provision acts by denying deductions for income tax purposes in respect of items allowed for the estate tax. The statute thus begins with the premise that the deduction must be allowed for estate tax purposes, and provides that it may then be disallowed for income tax purposes. We are not free to reverse the specific scheme for avoidance *492 of double deductions chosen by Congress. (Emphasis in original.) Accord Estate of Smith v. United States, 319 F. Supp. 174 (E.D. Mo. 1970). We have disallowed estate tax deductions in cases in which taxpayers earlier had taken income tax deductions based upon the same payments. In those cases, however, the taxpayers had filed the waiver statement described in section 642(g). The cases are, therefore, distinguished on that basis. E.g., Estate of Morris v. Commissioner, T.C. Memo. 1966-191. We will not find that petitioner waived the estate tax deductions merely by claiming the income tax deductions. Such a finding would render section 642(g)'s requirement of a waiver statement superfluous. Statutes are to be interpreted in a manner that renders them effective. Commissioner v. Jacobson, 336 U.S. 28, 42 (1949). Although section 642(g) does not apply, petitioner must nevertheless establish its entitlement to the deductions. Rule 142(a). We hold that the stud fees are deductible as claims against the estate under section 2053(a)(3). Section 20.2053-4, Estate Tax Regs., describes those amounts deductible under section *493 2053(a)(3) as follows: "The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured, * * *." The agreement to have Persepolis mate with Praise is dated November 24, 1982, and requires the payment of 65,000 French francs "sans conditions." The agreement for Vayrann's services is dated December 8, 1982, and requires that 40,000 French francs be paid on July 1, 1983. The fact that the payment of an additional 40,000 French francs is conditioned upon pregnancy leads to the fair inference that payment of the initial 40,000 French francs is not conditional. Because Mrs. Love was personally liable for both payments on the date of her death, we hold that petitioner may deduct the payments under section 2053(a)(3). [8]
*494 To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. The original agreement was drafted in French. Although we have adopted respondent's translation of the pertinent clause, we note that petitioner's translation does not materially differ from that of respondent.↩
2. All section references are to the Internal Revenue Code, as amended and in effect at the time of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Petitioner did not elect to have the alternate valuation dates specified in section 2032(a) apply.↩
4. We presume that this is a gross sale price, because the parties stipulated that the Shergar foal sold for $ 285,000 net of sales commission.↩
5. Estate of Cafaro v. Commissioner, T.C. Memo. 1989-348↩. 6. Petitioner does not contend that the $ 147,000 payment may be deducted as either a claim against the estate (section 2053(a)(3)) or an unpaid mortgage (section 2053(a)(4)). This is explained, perhaps, by the fact that amounts are not deductible under those subsections unless they constitute either personal obligations of the decedent on the date of death (section 20.2053-4, Estate Tax Regs.) or encumbrances against property included in the gross estate (section 20.2053-7, Estate Tax Regs.). Because Dunette did not become pregnant until after the date of Mrs. Love's death, no personal obligation may have existed at that time. Moreover, the estate tax return valued Dunette without foal. Thus, the property arguably subject to the encumbrance, i.e., the foal, was not included in the gross estate.↩
7. Respondent does not contend that petitioner has filed the " waiver statement" described in section 642(g). That statement waives the right to deduct specified items under section 2053 or 2054 "at any time."↩
8. Section 2053(a)(3) permits the deduction of claims against the estate which are "allowable by the laws of the jurisdiction * * * under which the estate is being administered." Neither party has addressed the effect of this requirement in the instant case. In view of the fact that the deducted sums were actually paid by petitioner, however, we do not view petitioner's failure to prove that the claims were presented and allowed by the probate court as an obstacle to their deductibility. Estate of Thiele v. Commissioner, 9 T.C. 473, 482-483 (1947); Estate of Wittmann v. Commissioner↩, a Memorandum Opinion of this Court dated June 20, 1952.