**Sondra RUBENSTEIN and Barry M. Tobias, etc., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 90–2785–CIV.

United States District Court, S.D. Florida.

July 2, 1993.

Leon J. Greenspan, Greenspan & Rosenblatt, White Plains, NY, Charles J. Kane, Miami Beach, FL, for plaintiffs.

Mark Stier, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

ATKINS, Senior District Judge.

THIS CAUSE came before the court for non-jury trial on October 27 and 28, 1992. Sondra Rubenstein (Rubenstein) and Barry Tobias (Tobias) (collectively referred to as plaintiffs), brought this action for the refund of estate tax, pursuant to Internal Revenue Code (I.R.C.) §§ 6532(a)(1) and 7422(a).

## FINDINGS OF FACT

At the trial, the Court received documentary and testimonial evidence. Based on this evidence, the Court makes the following findings of fact:

1. The plaintiffs brought this action seeking a refund of federal estate tax paid by the Estate of Irving Tobias (Estate). The plaintiffs are the personal representatives of the Estate.

2. Irving Tobias (decedent), had a stroke in 1979. Thereafter, his two children, plaintiffs, were responsible for handling his business affairs.

3. Decedent, a resident of Miami, Florida, died on March 26, 1984, leaving a Last Will and Testament.

4. The decedent's Last Will and Testament was admitted to probate in the Circuit Court for Dade County, Florida.

5. On May 24, 1984, Letters Testamentary were issued to plaintiffs Rubenstein and Tobias, both having been duly qualified to act as personal representatives of the Estate.

6. To date, plaintiffs continue to act as personal representatives of the Estate.

7. Decedent was a limited partner in two limited partnerships, Hillside Village (Hillside) and Shaler Properties (Shaler), that owned and operated two apartment house complexes in New Jersey. These entities were managed by Joseph Ratner (Ratner), the general partner of both limited partnerships.

8. The contracts outlining the limited partnerships provided that the agreements and the rights of the parties thereunder were to be governed by New Jersey law.

9. Prior to June, 1983, decedent's two partnership interests were placed in trust for Irving Tobias. Concurrently, the plaintiffs were appointed as co-trustees of the Irving Tobias Trust (Trust). Prior to decedent's death, Tobias, needing more money to pay for his father's needs, asked Ratner for additional funds from the two partnerships and received the requested funds.

10. In June, 1983, Ratner offered to purchase decedent's two partnership interests, as well as two identical partnership interests owned by another limited partner, Cecile Tobias (Cecile). During the acquisition of Cecile's interest, Ratner dealt with Cecile's son-in-law, Stephen Brown (Brown), who represented both Cecile and Rubenstein. Tobias was not involved in the negotiations. Ratner offered $1.5 million in exchange for each of the partnership interests owned by decedent and Cecile. Cecile accepted $1.5 million in exchange for her interest.

11. However, Tobias refused to authorize the sale of decedent's two partnership interests to Ratner.

12. During June, 1983, Brown informed Tobias that Ratner had been misappropriating funds belonging to both partnerships for over twenty years. Nevertheless, Tobias took no action based on this information.

13. When the purchase of decedent's partnership interests did not succeed, Ratner sued Rubenstein for specific performance and for damages for breach of contract.

14. Rubenstein answered Ratner's complaint without raising as a defense the rule that partners generally may not sue their partners at law. It is true, however, that both limited partnership agreements provide in section 12(f) that the general partner is not "liable, responsible, or accountable in damages or otherwise to any of the Partners for any acts performed by him in good faith within the scope of [the] Partnership Agreement." Accordingly, the limited partners were permitted to sue the general partner for acts performed in bad faith. In addition, (1) Rubenstein, as defendant in the Ratner litigation, individually and as personal representative of the Estate; (2) Tobias, counterclaimant in that action; (3) Rubenstein and Tobias, as fiduciaries of the limited partnership;[1] (4) Hillside and Shaler, additional defendants in the suit;[2] and (5) "all limited partners and persons having an interest in

---

1. *See* Second Amended Answer and Counterclaim at 6–7.

2. *Id.* at 7.

the partnerships or their properties," [3] counterclaimed against Ratner for $60 million in damages suffered by them because of Ratner's misappropriation of partnership funds and other misconduct. The counterclaim also sought: punitive damages; dissolution of the partnerships; a full and accurate formal accounting of the partnerships; restitution of all monies improperly taken, distributed, disbursed, or retained; and other relief including costs and fees.

15. After the litigation continued, Tobias authorized the attorney who represented him and Rubenstein in the Ratner litigation to settle that suit for approximately $3 million. The settlement stipulation did not allocate the settlement proceeds to the various claims. Instead, the stipulation essentially provided for an exchange of decedent's "right, title and interest in and to two certain partnership interests in New Jersey Limited Partnerships, known as HILLSIDE VILLAGE and SHALER PROPERTIES" for $3,375,000.00 plus other expenses and for release by the parties of other claims they may have possessed. *See* Stipulation of Settlement at 2–3.

Furthermore, plaintiffs' credible testimony regarding allocation of the proceeds at the time of settlement points to a conclusion that no party to the agreement clearly understood the settlement as consisting of two parts. Rubenstein, for example, testified that she understood that the settlement included property value and damages for Ratner's actions. However, she also testified that her estimate of the property value was based on what Brown and her attorney, Leon Greenspan, told her. She admitted not being able to recall exactly what the settlement was for. Additionally, Tobias testified that he understood payment received from Ratner included the Estate's interest in the property and damages under the counterclaim. Nevertheless, Tobias conceded that the settlement agreement did not reflect any division of the final figure. He further acknowledged that his understanding of the settlement was that he gave his attorney authority to settle the suit for the value of the property, including the amount of damages his father suffered as

a result of Ratner's actions. Finally, the Estate's tax return indicated that litigation of the partnership shares would substantially affect the valuation of the assets, thereby admitting the inability to determine the true value of the partnership interests.

16. This settlement agreement was entered into on January 21, 1986, effective as of December 31, 1985.

17. The settlement proceeds were paid directly to the plaintiffs and were neither shared with nor distributed to the two partnerships or the other partners in the two partnerships. The settlement stipulation provided that it was not to be filed with the court. The parties further agreed that the terms of the settlement would be held confidential and would not be discussed with third parties without prior written consent of Ratner.

18. On May 24, 1985, Rubenstein and Tobias, acting in their capacity as the personal representatives of the Estate, filed an estate tax return with the Internal Revenue Service (IRS) in Atlanta, Georgia.

19. On May 28, 1985, the Estate Tax Division of the IRS sent notice of receipt of the return.

20. The gross estate, as reported to the IRS on the return, was $1,644,085. This figure included the interest decedent held in the two partnerships, Hillside and Shaler, valued respectively at $454,263 and $1,045,737.

21. Plaintiffs based their evaluation of the two interests at issue on Cecile Tobias' August, 1983 sale of identical percentage interests in the limited partnerships.

22. The Estate tax return revealed that there was due and payable the net sum of $394,606. Of this amount, $47,000 had been previously paid. Accompanying that payment, the Estate submitted a form requesting I.R.C. § 6166 treatment to allow the Estate an extension of time for payment of estate tax because the estate consisted largely of interest in a closely held business. This request was denied. Therefore, the Estate was left with a deferred liability of $347,606.

3. *Id.*

23. In the income tax return, plaintiffs reported the settlement as an exchange of two partnerships for $3.375 million. The amount was comprised of two components: the $1.5 million value of the partnership interests themselves, plus approximately $1.4 million for the money wrongly taken by Ratner from the partnerships. The first figure was reported in the Form 706 Estate Tax Return and the second was reported as capital gain income in the Form 1041 U.S. Fiduciary Income Tax Return.

24. On or about April 5, 1987, the Department of Treasury rejected the Estate's tax return appraisal, disputing the valuation of the decedent's limited partnership interests by sending plaintiffs a thirty-day tax liability adjustment letter. The IRS assessed the gross estate at $2,998,641, respectively assessing the value of the Hillside and Shaler properties at $908,526 and $2,091,474. These values reflected the $1.5 million additional proceeds realized from the Ratner litigation settlement. At trial, however, parties stipulated that the aggregate **real estate** value of the two limited partnerships was $1,237,-333.50. Nevertheless, this is only part of the value of decedent's partnership interests.

25. Consequently, the IRS determined a deficiency in estate tax in the amount of $734,865, bringing the total tax due to $1,129,471.

26. On April 21, 1987, the Estate filed its appeal from the IRS examiner's findings and requested an appeals conference to review the Department of Treasury's assessment of the deficiency in estate tax liability. On April 28, 1988, the IRS informed the Estate that a determination of the estate tax liability disclosed the same deficiency in the amount of $734,865. *See* Plaintiffs' Exhibit 22. In that deficiency letter, the IRS informed the Estate that it had ninety (90) days from the mailing date to petition the U.S. Tax Court for a redetermination of the tax owed. Further, the letter notified the Estate that it had the option not to file a petition by signing a Form 4089 waiver, thus permitting the IRS to charge the deficiency to the Estate's account quickly and limit the accumulation of interest. If no selection was made, the account would be billed automatically ninety (90) days after the letter's mailing date. Finally, the letter detailed the Estate's rights regarding claims for refund and ability to file suit in a district court or in the U.S. Claims Court and notified the Estate that signing the waiver did not prevent the IRS from later determining that the Estate owed an additional tax, nor did the waiver allow an extension of time for the Estate to exercise its above rights.

27. On October 12, 1988, the IRS sent the Estate a Statement of Tax Due on Federal Tax Return. *See* Plaintiffs' Exhibit 23. This notice informed the Estate that it had ten (10) days to pay the tax due on the Estate's account. The tax due included the $734,865 deficiency and restricted interest in the amount of $350,299.14, presumably including the $347,606 deferred liability. This brought the total tax due to $1,085,164.14.

28. Plaintiffs, on behalf of the Estate, paid the sum of $1,090,000 by check dated December 12, 1988. The Estate's accountant, Morris Kirsh, testified that the $1,090,-000 was submitted as full payment of the estate tax deficiency plus interest to date. Thus, admitting knowledge that interest was accruing at that time.

29. The government received the check on December 21, 1988. The IRS applied this amount to the unpaid assessed tax claimed to be due by the government and applied the balance of the payment to interest thereon claimed by the government to be due and owing.

30. On or about November 20, 1989, plaintiffs filed an amended refund claim on behalf of the Estate to the Commissioner of Internal Revenue (the original claim was filed on December 30, 1988). The claim demanded a refund of the tax and interest assessed as a deficiency and paid by the Estate, all as provided by law.

31. The Commissioner of the IRS acknowledged receipt of the timely filed claim and amended claim. To date, the IRS Commissioner has neither credited, refunded, nor repaid the plaintiffs any part of the claim.

32. In fact, the government claimed that after application of plaintiffs' payment as stated, there was a certain amount of as-

sessed interest that remained unpaid. Although the Estate paid the entire amount of estate tax, the government testified that the Estate did not pay the tax timely and it did not pay the interest accrued on that tax. The government, through Sarah Northard, an Internal Revenue Agent, testified that the $1.09 million payment was applied first to the tax and then to the accrued interest. She stated that the balance did not pay all that was due. The agent also testified that the deferral of the original $394,606 estate tax did not abate interest; interest accrued from the date of deferral. Consequently, on November 12, 1991, the IRS sent the Estate a Certificate of Assessments and Payments (CAP).

The agent, interpreting the CAP, prepared by another IRS employee, testified that the Estate's account balance as of May 20, 1991, was $400,004.89. This figure included all payments made by the Estate and all interest owed by the Estate for failure to pay the tax timely. The agent did admit, however, that if the tax forms were filed correctly, there would be no interest due and owed by the Estate.

33. Plaintiffs have paid a total tax of $1,233,637.00.

34. In the present suit, plaintiffs claim that they have been damaged in the sum of $839,031.00, without consideration of interest payable or receivable.

35. More than six (6) months have elapsed since the filing of the amended claim for refund without any action on the part of the IRS.

### CONCLUSIONS OF LAW

In light of the findings of fact recited above, the Court reaches the following conclusions of law:

1. This Court has jurisdiction over the action, pursuant to 28 U.S.C. § 1346(a) (1993), and has jurisdiction over the government's counterclaim under 28 U.S.C. § 1346(c) (1976). Pursuant to I.R.C. §§ 6532(a)(1) and 7422(a), the Estate moves for refund.

2. In an action brought pursuant to 28 U.S.C. § 1346(a)(1), this Court is required to redetermine the entire tax liability. *Lewis v. Reynolds,* 284 U.S. 281, 283, 52 S.Ct. 145, 76 L.Ed. 293 (1932). Courts conduct a *de novo* review of the correctness of assessment without looking "behind an assessment to evaluate the procedure and evidence used in making the assessment." *Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir.1987). However, when the assessment is shown to be "without rational foundation" or "arbitrary and erroneous," the courts will not even grant the assessment a rebuttable presumption of correctness. *See Helvering v. Taylor,* 293 U.S. 507, 514–15, 55 S.Ct. 287, 290–91, 79 L.Ed. 623 (1935).

3. In this suit for the refund of taxes, the plaintiffs bear the burden of proof, as well as the burden of persuasion. *United States v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046, *reh'g denied,* 429 U.S. 874, 97 S.Ct. 196, 50 L.Ed.2d 158 (1976); *Taylor,* 293 U.S. at 515, 55 S.Ct. at 290; and *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). In a refund action in district court or the Claims Court, the taxpayer bears the burden of proving the assessment is erroneous. *Janis,* 428 U.S. at 440, 96 S.Ct. at 3025 (1976); *Bull v. United States,* 295 U.S. 247, 260, 55 S.Ct. 695, 700, 79 L.Ed. 1421 (1935); *R.E. Dietz Corp. v. United States,* 939 F.2d 1, 4 (2d Cir.1991); *Portillo v. Comm'r,* 932 F.2d 1128, 1133 (5th Cir.1991), *rev'd on other grounds,* 988 F.2d 27 (5th Cir.1993); *Hornsby v. IRS,* 588 F.2d 952, 953 (5th Cir.1979). The Certificate of Assessments and Payments prepared by the IRS to reflect the debt owed by the taxpayer is presumed to be correct. *United States v. Chila,* 871 F.2d 1015, 1018 (11th Cir.1989), *cert. denied,* 493 U.S. 975, 110 S.Ct. 498, 107 L.Ed.2d 501 (1989).

4. The assessment in this case was based upon the Estate's submission of its income and estate tax forms. When determining the estate tax due, the value upon which the tax is based is determined under I.R.C. § 2031—Definition of gross estate. Section 2031(a) provides as follows:

(a) General.—The value of the gross estate of the decedent shall be determined by

including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or *intangible*, wherever situated.

(emphasis added).

5. I.R.C. § 2033 provides that

The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.

■■■ Valuation of an estate is determined by the interest that passes and, therefore, the value of the interest before or after death does not affect the value of the estate; it only serves as a factor for determining value at death. *United States v. Land,* 303 F.2d 170 (5th Cir.), *cert. denied,* 371 U.S. 862, 83 S.Ct. 121, 9 L.Ed.2d 100 (1962).[4] Similarly, the value of an estate includes any rights to income or choses in action, acquired before death or because of decedent's death, that remain unpaid at the time of death. *Estate of Aldrich v. Comm'r,* 46 T.C.M. (CCH) 1295, 1983 WL 14523 (1983). Therefore, while rent, interest and dividends accruing after death are excluded from the estate, the right to income acquired by death is included, *id.,* even where there is uncertainty as to the amount. *Duffield v. United States,* 136 F.Supp. 944 (E.D.Pa.1955).

■■■ 6. This circuit's predecessor has held that choses in action are considered intangible property under I.R.C. § 2031 and are includable in the gross estate. *United States v. Simmons,* 346 F.2d 213 (5th Cir. 1965).[5]

7. *Simmons* involved a taxpayer's suit for estate tax refund. The decedent, B. Hill Simmons (Simmons), died on December 27, 1955. Prior to Simmons' death, the IRS began an investigation of his income tax returns for the years 1941 through 1953. As a result of the investigation, Simmons paid a deficiency in the amount of $43,000.00. Prior to his death, Simmons never considered filing a claim in order to recover the refund of these taxes. However, after Simmons' death, the executors of the estate hired an attorney to investigate the decedent's tax affairs.

On February 1, 1957, Simmons' estate filed a claim for the refund of $60,000.00 in overpaid taxes. Finally, in 1960, the Department of Justice approved the executors' offer of compromise, and settled the claim for $41,187.00.

After the suit settled, the Commissioner determined that the legal claim was includable in Simmons' estate and valued the claim at the amount of the settlement. However, the jury ultimately concluded that the claim was valueless at the time of Simmons' death.

The Fifth Circuit held that the trial court correctly denied the motions for directed verdict and judgment n.o.v., but reversed the judgment and remanded the case for a new trial, stating that, "there was no rational basis for the jury's finding that the claim for an income tax refund was valueless on the date of the decedent's death." *Id.* at 215. The court held that Simmons' claim for refund of federal income tax was "property" under I.R.C. § 2031. Therefore, the claim was an asset properly includable in the gross estate.

■■■ In its analysis, the *Simmons* court applied the "willing buyer and seller test" to the claim for income tax refund[6] and

---

**4.** *But see Estate of Bary v. Comm'r,* 368 F.2d 844 (2d Cir.1966) (Commissioner determined that, at the time of decedent's death, the estate's sole asset, a claim against a foreign government, had zero value. Subsequent payment of the claim nineteen years later was held taxable only as ordinary estate income because the collection of the claim was not a sale or exchange of a capital asset.).

**5.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*But see American Nat'l Bank & Trust Co. v. United States,* 594 F.2d 1141 (7th Cir.1979) (assessment of penalty for late filing of tax due on amount recovered on claim after death of a decedent is based on value of claim at time of death and not on sum recovered).

**6.** The "willing buyer and seller test" is applied by Treasury Regulation § 20.2031–1(b) to all questions of valuation and is evaluated using a legal fiction in which the "willing buyer and seller" are hypothetical entities having reasonable knowledge of relevant facts. *Id.* at 217. *See Bank of California v. Comm'r,* 133 F.2d 428 (9th Cir.1943) (decedent's claim for refund of income

concluded that the amount of settlement[7] does not necessarily reflect the fair market value of the claim at the date of death.[8] The court noted that in similar cases the U.S. Tax Court has held that later discovered facts *do* contribute to the value of the property at the date of the death.[9] The court recognized that a delay is present in the administration of every estate before a representative becomes acquainted with all relevant existing facts affecting the value of the property. Therefore, federal law must be applied in a flexible and realistic manner in order to accommodate this delay. *Simmons*, 346 F.2d at 217. Concluding, the Fifth Circuit stated that "it [was] impossible to believe that Congress intended valuation to be tested subjectively according to the state of mind of an executor making the return in question, the valuation depending on whether he was diligent and efficient in examining the decedent's records." *Id.*

Therein, the court found that Simmons' executors knew that the estate's claim was not valueless; the executors, attorney, and accountants simply had not examined Simmons' records to assess the value of the claim and support the claim with evidence that had always been available to them.[10] The court

held that, *"ignorance of the value of an asset at the time of a decedent's death does not justify treating the asset as valueless,* any more than ignorance of the existence of an asset discovered after the date of death, justifies exclusion of the asset from the decedent's gross estate." *Id.* at 218 (emphasis added).

The court stated that the amount of the compromise should be considered as *"highly indicative* of the fact that the claim had value at the time of Simmons's (sic) death." *Id.* (emphasis added). Consequently, there existed no rational basis for the jury's finding that the claim for an income tax refund was valueless on the date of the decedent's death. The court ultimately remanded the cause to the district court with instructions to grant the Motion for New Trial.

■ 8. This Court finds that the Estate's gross estate must include the value of the Estate's claim against Ratner in the Ratner litigation. Merely because the Ratner litigation was not commenced until facts were disclosed after the decedent's death does not prevent the claim from inclusion into the gross estate. *Estate of Baldwin v. Comm'r*, 18 T.C.M. (CCH) 902, 1959 WL 1193 (1959).

---

taxes is includable in the gross estate; the value of the claim being assessed at fair market value as between a willing buyer and seller at the time of decedent's death).

7. The amount of settlement is a factor that is relevant, yet not conclusive in determining fair market value. *Id.* at 216.

8. Fair market value is a factual issue, determined by the jury. *Id.*

9. *See Estate of Baldwin v. Comm'r*, 18 T.C.M. (CCH) 902, 1959 WL 1193 (1959), holding that [a]n estate may possess many assets, tangible and intangible, of which the deceased's representative or even the deceased himself may be unaware, and which may not become apparent until the lapse of a substantial period of time after death. Such property is for that reason no less an asset of the estate, nor can it necessarily be said to be valueless at the date of death. This is particularly true where, as here, the asset is one which by its nature is discoverable in the ordinary course of administration of the estate.
However, in a case where the value of the claim on the date of decedent's death **exceeded** the later actual recovery, the *Baldwin* court followed

the Ninth Circuit in holding that "the value of a tax refund claim must be determined as of the date of decedent's death, and is not controlled by the size of the eventual recovery."
*See also Estate of Aldrich v. Comm'r*, 46 T.C.M. (CCH) 1295, 1983 WL 14523 (1983) ("[T]he Estate includes any rights to income or choses in action which remain unpaid at the time of decedent's death, but not income the right to which accrues after decedent's death."); *Estate of Biagioni v. Comm'r*, 42 T.C.M. (CCH) 1663, 1981 WL 11154 (1981); *Estate of Curry v. Comm'r*, 74 T.C. 540, 1980 WL 4454 (1980); *Duffield v. United States*, 136 F.Supp. 944 (E.D.Pa.1955); and *Estate of McGlue v. Comm'r*, 41 B.T.A. 1199, 1940 WL 277 (1940).

10. Reasonable knowledge of the relevant facts would have revealed to Simmons and his accountant, as later discovered by the estate's attorney, that there were major flaws in the IRS report sent to Simmons before his death. Reasonable knowledge would also have led Simmons, his accountant, attorney, or executors to be aware of a certain memorandum that rebutted the Commissioner's findings. All of the necessary records existed and were among Simmons' papers when he passed away.

9. "Value," for purposes of the federal estate tax, means "fair market value." *United States v. Cartwright*, 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *First Nat'l Bank v. United States*, 763 F.2d 891 (7th Cir.1985). "Fair market value" is defined as follows:

> The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and *both having reasonable knowledge of relevant facts.*

Treas.Reg. § 20.2031–1(b) (emphasis added); *First Nat'l Bank*, 763 F.2d at 893. A subsequent sale made reasonably close to the valuation date is generally persuasive evidence of fair market value, except where a material change in circumstances between the valuation date and the sale date renders the subsequent sale unforeseeable. *Estate of Love v. Comm'r*, 57 T.C.M. (CCH) 1479, 1989 WL 99436 (1989), *aff'd*, 923 F.2d 335 (4th Cir. 1991).

10. Under the analysis of *Simmons*, fair market value is a factual issue, determined by the trier of fact. Therefore, in this case, the Court holds that fair market value of the decedent's partnership interests included not only the value of the real estate, but also the relative worth of the Estate's claim against Ratner as alleged in the New York suit counterclaim. This Court finds that the value of the Estate's *claim* is calculated by determining the Estate's recovery of all value over and above the stipulated assessment of the **real estate** held by the two partnerships. At trial, the parties stipulated that the partnership's real estate was worth $1,237,333.50. Thus, the difference between this value and $3.375 million conclusively established the relative worth of the claim at $2,137,666.50. Therefore, plaintiffs and Ratner, both with *full* knowledge of the relevant facts, exchanged plaintiffs' claim against Ratner for $2,137,666.50.

11. Ratner's conduct transpired over a period in excess of twenty years. Almost all of this conduct occurred while decedent was still alive. Therefore, the right to seek damages arose before decedent's death and was an intangible asset of the decedent that should have been included in his Estate. *Simmons*, 346 F.2d at 218; *Baldwin*, 18 T.C.M. (CCH) 902, 1959 WL 1193 (1959).

12. In the alternative, the value of the two partnership interests *included* the value of the claim against Ratner. Thus, even if the Estate's share of the underlying assets of the two partnerships (i.e., the apartment complexes) was worth only $1,237,333.50, the Estate's share of the partnerships also included its proportionate share of the partnerships' claim against Ratner for his misconduct. The purchase price received in settlement for the partnership interests is "highly indicative" of the value of decedent's share of the proportionate claim. *Simmons*, 346 F.2d at 218. Consequently, this Court finds that the decedent's share of the claim against Ratner is the amount received in settlement of that claim, namely $2,137,666.50.

13. Plaintiffs failed to prove that the price paid for Cecile's two partnership interests, identical to those owned by the Estate, was fair market value. The value of the decedent's and Cecile's interests were different because decedent's share included an additional claim over and above the limited partnership interest owned by Cecile.

14. Moreover, plaintiffs presented no credible evidence indicating that Cecile sold her partnership interests with "reasonable knowledge of relevant facts." Treas.Reg. § 20.2031–1(b). There is no evidence that, at the time of Cecile's sale, she or her representative, Stephen Brown, were aware of the extent of Ratner's misconduct in misappropriating the partnerships' funds. Cecile possessed less "relevant facts" at the time of her sale than those known by plaintiffs at the time of their settlement. Therefore, the two sales are neither factually comparable nor similarly valued.

## CONCLUSION

The Commissioner correctly determined that the value of the settlement of the claim against Ratner must be included in decedent's gross estate.

In light of the foregoing, it is

ORDERED AND ADJUDGED that judgment shall be entered in favor of the defendant, United States of America, and against plaintiffs, Sondra Rubenstein and Barry Tobias as co-personal representatives of the Estate of Irving Tobias, by separate order, pursuant to Fed.R.Civ.P. 58.

DONE AND ORDERED.