ESTATE OF GERTRUDE H. SAUNDERS, DECEASED, WILLIAM W. SAUNDERS, JR., AND RICHARD B. RIEGELS, CO-EXECUTORS, PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10957–09.     Filed April 28, 2011.

Decedent's estate claimed a deduction of $30 million in relation to litigation pending against the estate at the date of death. The case was submitted on stipulated facts and an offer of proof for a preliminary determination as to whether the amount of the claim was ascertainable with reasonable certainty and deductible as of the date of death, in accordance with sec. 20.2053–1(b)(3), Estate Tax Regs. *Held*: Different standards apply to including a claim in favor of an estate in the gross estate and deducting a claim against an estate for estate tax purposes. *Held*, *further*, as demonstrated by the expert reports submitted on behalf of the estate, the value of the claim was too uncertain to be deducted based on estimates as of the date of death and must be deducted based on the ultimate outcome, in accordance with the regulation.

*Thomas F. Carlucci*, for petitioner.
*Andrew R. Moore* and *Shannon Edelstone*, for respondent.

OPINION

COHEN, *Judge*: Respondent determined a deficiency of $14,400,000 in estate tax due from the Estate of Gertrude H. Saunders (decedent). Respondent also determined a penalty under section 6662(h) of $5,760,000, but that penalty has

406

now been conceded. The case is before the Court for a preliminary determination of whether a claim against the estate satisfies the requirements of section 20.2053–1(b)(3), Estate Tax Regs., as in effect for the date of the decedent's death that a claim may be deducted "though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and will be paid." (Respondent concedes that final regulations at section 20.2053–1(b)(3), Estate Tax Regs., effective for estates of decedents dying on or after October 20, 2009, are not applicable although they are consistent with respondent's litigating position in this case and in prior cases discussed below.) Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the date of decedent's death, and Rule references are to the Tax Court Rules of Practice and Procedure.

Before a scheduled trial date in San Francisco, California, the parties submitted expert reports in accordance with Rule 143(g) and pretrial memoranda as required by the Court's standing pretrial order. The parties then requested a conference call to discuss a date and time certain for trial to accommodate numerous witnesses who would be expected to travel from Hawaii and other places. During those conversations, the Court suggested that review of the tendered expert reports and the legal authorities cited in respondent's pretrial memorandum raised a question that could be decided preliminarily and possibly avoid an expensive trial. In the Court's stated view, the differences between the experts as to the correct value to be placed on a claim against the estate were an indication that the value of the claim could not be ascertained with reasonable certainty. By agreement of the parties, that issue has been briefed and submitted on stipulated facts and the estate's offer of proof.

If the preliminary issue is decided in favor of the estate, the issue of the correct value to be placed on the claim remains for trial. If the preliminary issue is decided in favor of respondent, the claim ultimately paid may be treated as a deduction in the final computation of the estate tax liability.

*Background*

Decedent, a resident of Hawaii, died on November 27, 2004. She was predeceased by her husband, William W. Saunders, Sr. (Saunders), who died on November 3, 2003. Prior to his death, Saunders was a practicing lawyer and at one time represented Harry S. Stonehill (Stonehill).

William W. Saunders, Jr. (Saunders, Jr.), and Richard B. Riegels are coexecutors of the estate and resided in Hawaii at the time the petition was filed. Between approximately June 1988 and March 2004, Saunders, Jr. was a partner in the law firm formerly known as Bickerton Saunders & Dang and later known as Bickerton Lee Dang & Sullivan.

*The Stonehill Litigation*

Robert Heggestad (Heggestad), a partner in a Washington, D.C., law firm, beginning in 1990 was lead counsel in extensive tax litigation involving Stonehill. See *United States v. Stonehill*, 83 F.3d 1156 (9th Cir. 1996); *United States v. Stonehill*, 959 F.2d 243 (9th Cir. 1992); *United States v. Stonehill*, 702 F.2d 1288 (9th Cir. 1983); *Stonehill v. United States*, 405 F.2d 738 (9th Cir. 1968). After 10 years of litigation, including litigation relating to Freedom of Information Act (FOIA) production, Heggestad obtained numerous previously classified documents from the Internal Revenue Service (IRS), Federal Bureau of Investigation, State Department, and Department of Justice. Among the documents Heggestad received during the FOIA litigation was an April 27, 1960, memorandum by IRS agent James H. Griffin (the Griffin memo). The Griffin memo suggested that Saunders had acted as a secret IRS informer against the interest of his client, Stonehill.

Heggestad engaged co-counsel, John Edmunds (Edmunds), a plaintiffs' counsel in Honolulu, Hawaii, in relation to potential claims against Saunders by the Estate of Harry S. Stonehill (the Stonehill estate). (Stonehill died in 2002.) Heggestad recognized legal impediments or hurdles involved in pursuing the claims but believed that he and Edmunds could overcome them. Heggestad and Edmunds had sufficient confidence in the case to take it on a contingency fee basis, understanding that if they did not prevail they would not get paid, unless the matter otherwise settled. Heggestad and

Edmunds prepared a demand letter on behalf of the Stonehill estate alleging that Saunders had committed legal malpractice, breach of confidence, breach of duty of loyalty, and fraudulent concealment against Stonehill.

The demand on the Estate of William Saunders, Sr. (the Saunders estate) by the Stonehill estate was based on the claim that Saunders, while Stonehill's attorney, had informed the IRS that Stonehill maintained a Swiss bank account. Allegedly as a result of this disclosure, the IRS investigated Stonehill for tax fraud, leading to jeopardy assessments for 1958–62 and a 1975 suit to reduce the assessment to judgment and to foreclose liens. The claimed consequence of these actions was loss of business interests and property from the collection of taxes.

The demand letter was received by Saunders, Jr. on September 15, 2004, 73 days before decedent's death. Saunders, Jr. consulted James J. Bickerton (Bickerton), a former partner of Saunders, Jr., and retained Bickerton to represent the Saunders estate with respect to the claim by the Stonehill estate.

On September 24, 2004, 64 days before decedent's death, the Stonehill estate filed formal complaints against the Saunders estate in the U.S. District Court for the District of Hawaii (Hawaii Federal District Court) and in a Hawaii State court. The complaints were prepared by Heggestad and Edmunds and alleged four causes of action for legal malpractice, breach of confidence, breach of duty of loyalty, and fraudulent concealment. The complaints requested over $90 million in compensatory damages, plus additional punitive damages.

From September through November 2004, Saunders, Jr. and Bickerton were unsuccessful in finding any relevant or material evidence that would benefit the defense of the Stonehill claims. Saunders, Jr. believes that the difficulty was due to the significant passage of time from the date of the alleged misconduct and the date the claims were made. However, they did learn that relevant documents might be in Oregon. Elizabeth Anne Saunders, Saunders, Jr.'s sister, is an attorney residing in Oregon. Beginning on October 14, 2004, and on several occasions thereafter, she went to the U.S. District Court for the District of Oregon in Portland to

search for documents from earlier tax litigation involving Stonehill.

Bickerton entered an appearance and answered the Hawaii Federal District Court complaint on October 7, 2004. In mid-December 2004, Saunders, Jr. retained John Francis Perkin (Perkin), a member of the Hawaii firm Perkin & Faria, as litigation counsel. Although Perkin became lead counsel, Bickerton remained involved in the Stonehill litigation until its final resolution.

Perkin entered his appearance in the State case on February 2, 2005, by filing a motion to dismiss. He answered the State complaint on March 28, 2005. On July 18, 2005, Saunders, Jr., Perkin, and Brandee Faria of Perkin & Faria traveled to Portland, Oregon, to examine documents potentially related to the Stonehill litigation.

Trial preparation, discovery, depositions, and motions proceeded over the course of the next year and a half. From approximately May 2006 through July 2007, the parties discussed settlement prior to and during trial, but no settlement was reached.

On April 17, 2007, the Saunders estate, as defendant, moved for summary judgment in the Hawaii State court as to damages on the ground that the Stonehill estate could not prove any damages. On August 24, 2007, the State court granted the motion to the extent that that court would not allow relitigation of the underlying Stonehill tax judgment but denied the motion as to the remainder of the relief sought.

Before and during trial of the State court action, settlement demands and offers were exchanged. The Stonehill estate's demands ranged from a high of $7.5 million before May 1, 2006, to a low of $2.5 million in July 2007. The Saunders estate's offers ranged from a low of $250,000 in May 2006 to a high of $2.6 million in June 2007.

On May 28, 2007, a jury trial commenced in the Hawaii State court. The trial lasted approximately 6 weeks. The jury found that Saunders had breached his fiduciary duty of confidentiality and his duty of undivided loyalty to Stonehill but also found that neither breach was a legal cause of injury or damage to Stonehill or to his estate. Judgment was entered by the State court on October 23, 2007. Costs of $289,000 were awarded to the Saunders estate in the final judgment.

The Stonehill estate appealed the judgment, but the litigation was ultimately resolved by a settlement agreement and mutual release. The Saunders estate paid $250,000 in attorney's fees to the Stonehill estate's attorney and waived its right to the $289,000 costs awarded in the State court judgment.

*Estate Tax Returns*

A return for the Saunders estate was filed February 2, 2005. A deduction of $30 million was claimed on the return in relation to the Stonehill estate malpractice claim. The estate tax return was examined. On December 31, 2009, a closing document was issued stating that the value of the malpractice claim would be resolved in the estate of the surviving spouse, decedent here.

A return for the estate of decedent was filed February 23, 2006. A deduction of $30 million was claimed on the return in relation to the Stonehill estate malpractice claim. Because of the ongoing nature of the Stonehill litigation at the time this return was filed, a statement attached to the return referred to an appraisal letter prepared by Perkin dated August 30, 2005.

In the notice of deficiency sent February 10, 2009, the amount of $1 was allowed as a deduction for the malpractice claim in lieu of the $30 million claimed by the estate.

*Expert Reports*

In the Perkin letter dated August 30, 2005, Perkin opined:

From the information available in November 2003, it would appear that Mr. Saunders may have revealed such information to the United States attorney for the District of Hawaii at the very least, and government documents did state that he did. Potential defenses to liability exist and could be recognized as of November 2003, including the likelihood that Mr. Saunders would have revealed the information as a business partner or participant with Mr. Stonehill, rather than as Mr. Stonehill's attorney. Moreover, it could be argued that the information concerning Swiss banks was not privileged or confidential. However, as of November 2003, the viability of such defenses would have been very difficult to evaluate. However, should a jury determine that Mr. Saunders was assisting the government against a client for his own gain as alleged, and allowed Mr. Stonehill to testify denying Swiss bank accounts after revealing his use thereof to the government, or revealed other confidential or privileged information, an unfavorable verdict on liability would appear a near cer-

tainty. As of November 2003, insufficient information was available to discount such an outcome.

Under the heading "Damages", Perkin stated:

The determination of damages will largely depend on the results of the Estate of Mr. Stonehill's current attack on the federal tax judgments rendered against Mr. Stonehill. If this attack succeeds and liability is found, a ninety million dollar ($90,000,000) judgment would be within the reasonable verdict range for a jury, as would any lesser amount. With the scarce information available as to this as of November 2003, the likelihood of this occurring would have been uncertain but seem to range between twenty-five to fifty percent.

* * * * * * *

Failing the overturn of the federal tax judgments, the damages assessed could range from nominal ($1) to a substantial portion of the Estate if punitive damage [sic] are assessed. Jury instructions add to the significance of fiduciary duties and an attorney's duties are certain to be powerful, and are likely to provoke a verdict on the high end of the probable range between one dollar ($1) and ninety million dollars ($90,000,000.00).

Perkin concluded with a valuation of $30 million, stating: "While a higher figure can easily be justified, a substantial discount should be applied because of settlement possibility and the wide range of unknowns as of November 2003."

Perkin also prepared a letter appraisal dated October 26, 2009, which began:

Now that the case has been settled and the appeal dismissed, I will, at your request supplement my evaluation of the claims in the above-captioned case rendered in August, 2005. At that time, because I was told my opinion letter would be given to the IRS, I anticipated that it could wind up in the hands of the Plaintiff's attorneys, who would not have hesitated to try to use the contents as "admissions" by the Saunders Estate, on the basis of a waiver of attorney-client privilege. * * *

After discussing the litigation in greater detail than he had in his 2005 letter, Perkin stated:

Finally, of course, some discount was warranted based on the general principle that there are a few certainties in litigation, particularly where a jury will be involved.

In summary, the Stonehill Estate had to be anticipated to be able to prove damages in the claimed amount of $90 million at least, making a two-thirds discount for a valuation of $30 million perhaps lower than was warranted. While I am uncomfortable with "decision tree" analysis as applied by non-lawyer "experts" to complex litigation, I have spent over thirty years evaluating and trying litigation claims in Hawaii, including

advising insurance companies concerning the setting of reserves and settlement in over a hundred cases. I have handled a number of legal malpractice cases, two to verdict. I am listed in "Best Lawyers in Hawaii" and "Best Lawyers in America", and have a Martindale Hubbell AV rating. While the Saunders Estate was lucky enough to duck this particular bullet, I continue to believe that the valuation I rendered in August 2005 of $30 million was reasonable on the low side and as low as the known facts allowed. However, taking a somewhat different approach as to what someone might have paid for the claim in 2003–2004, an additional discount of $5 million to reach a revised total of $25 million would have been prudent in light of the time and expense necessary to pursue the claim, and the approximate value of the Estate itself as between $30–$40 million.

On February 6, 2008, Philip M. Schwab (Schwab), senior vice president with FMV Valuation & Financial Advisory Services, prepared a report valuing "a contingent liability" associated with the Stonehill litigation as of November 27, 2004. Schwab expressed his understanding that postdeath events could not be considered. The report explained:

The scope of our investigation included discussions with representatives of the Estate regarding the history and nature of the Contingent Liability. In the course of our analyses, among other things, we have relied upon certain verbal and written representations of the Estate's representatives. We have also relied on various documents related to the Contingent Liability, as further discussed below, which were provided to us by representatives of the Estate (collectively, "Documents"). In addition, we have relied on certain facts and assumptions regarding the status and possible course of the existing litigation as provided by John Francis Perkin, Esq., of Perkin & Faria, an attorney currently retained by the Estate to mediate and/or litigate matters related to the Contingent Liability. The information provided to us by representatives of the Estate has been accepted, without additional verification, as correctly reflecting the nature and condition of the Contingent Liability as of the Valuation Date.

Schwab applied what he described as a "decision tree analysis", that "follows through various possible course of action identified with the help of Mr. Perkin that could occur in the course of investigating, negotiating, and/or litigating the Lawsuit including numerous opportunities to settle." Other matters considered were described as follows:

Monetary values were based on estimated settlement amounts and possible damages that could be collected from the Estate should the plaintiff prevail at trial and on appeal. Since the Lawsuit was filed against the Estate of William W. Saunders and the actual damages that could be collected by the plaintiff would be limited to the available assets of the Estate, we have considered, with the assistance of legal counsel for the

Estate, the available assets of the Estate in our estimation of the collectible damages amount and possible settlement amounts.

With reference to determination of an applicable discount rate, Schwab's report explained:

In selecting an appropriate discount rate, we looked primarily to high-yield and defaulted corporate bonds (bonds rated BB to C, and bonds that are in default, respectively) because of the relatively similar uncertainty about collectibility. These high-risk debt instruments have higher yields to maturity than lower-risk debt instruments due to (a) their higher expected volatility of returns and (b) their higher default or collectibility risk. Because the probability that no liability will be incurred is already considered within our multi-scenario decision tree analyses, we selected a discount rate based only on the return attributable to higher expected volatility associated with high-yield debt compared to lower-risk debt instruments. This rate is the expected rate of return on the high-yield debt instrument after removing the yield factor attributable to the default risk.

With respect to an adjustment for lack of assignability, Schwab's report stated:

The decision tree employed above only quantifies the economic impact associated with costs, time and uncertainties of defending the Lawsuit. However, as of the Valuation Date, the holder of the Contingent Liability also lacks the ability to assign the liability for the Lawsuit due to the lack of a market for assigning post-claim liabilities (such as the Contingent Liability) and any available insurance products to cover against the potential damages. The Contingent Liability represents a liability with unique facts, circumstances, and risks, and would therefore require a substantial underwriting effort, in contrast with underwriting costs associated with insurance covering medical and environmental liabilities, among other things. We have done research into what market may exist and have found no entities involved in the insurance or assignment of litigation claims. Based on previous discussions with insurance professionals, it is our understanding that insurance companies account for the existence of a secondary market in pricing insurance policies. Accordingly, the holder of the Contingent Liability would likely have to pay a premium to a hypothetical willing holder of the Contingent Liability to compensate for the lack of the ability to assign the Contingent Liability. Such a premium would be warranted for the Contingent Liability since the holder has no way to get out of the liability or hedge against it. Further, should the holder of the Contingent Liability be unable to assign it, the assets of the Estate would likely need to be maintained, rather than consumed or distributed, until the Lawsuit is resolved. Restricting the assets of the Estate further erodes the value of the Estate and should be considered in valuing the Contingent Liability. Accordingly, an adjustment for lack of assignability of 25 percent has also been applied to the aggregate weighted average monetary value. * * *

Using his described methodology, Schwab valued the contingent liability at $19,300,000.

On September 15, 2010, in preparation for trial of this case, Bickerton prepared a report for the estate. On the basis of his experience as a Hawaii contingency fee attorney, Bickerton opined that "plaintiffs' lawyers generally do not take on contingency work unless they have a substantial probability of prevailing on the merits, typically at least 75%, regardless of the size of the potential damages award." Bickerton concluded:

I am familiar with John Edmunds, having had cases adverse to him and having discussed a number of cases with him, having been familiar with many of his cases from news and personal accounts of others, and knowing his reputation in the legal community. Based on that foundation, it is my opinion that John Edmunds would have applied formulas similar to the above analysis in his case screening and intake decisions on the Stonehill case and would not have undertaken the case unless he genuinely believed, after careful analysis and due diligence, that there was a 75% or better chance of obtaining a jury verdict in excess of $30 million such that the case had a risk-adjusted value of $22.5 million or more at the time he commenced it.

Respondent submitted the expert report of James E. King (King), a California litigator who had handled a number of legal malpractice cases. King reviewed the reported Stonehill tax litigation as well as the record in the Stonehill case against the Saunders estate and concluded "that the claim had no merit (at most a 3% chance of recovery if pursued fully), and that the information upon which that conclusion is based was known or knowable at the date of death."

Respondent also submitted an expert report dated September 17, 2010, prepared by James E. McCann (McCann), valuation specialist for the IRS. McCann relied on information and estimates King provided and on conversations with respondent's counsel. He selected a "discounted cash flow valuation method", considering the "estimated outcome scenario, probability, timeline, and cash flow expense variables" King provided to him. In a table that was part of McCann's report, he illustrated:

[A]pportioned values for each of the nine outcome scenarios range from a low of $25,449 (see Outcome scenario 1), to a high of $1,500,395 (see Outcome scenario 5). Each of these nine apportioned values is added together,

to yield a combined, probability-adjusted, net present value of $3,200,000 for the Contingent Liability. * * *

*The Estate's Offer of Proof*

Although the parties were able to submit a substantial stipulation as to the documents and the expert reports, they did not stipulate as to the testimony that the estate would offer at trial from the fact witnesses, including Heggestad, Bickerton, and Saunders, Jr., about their views of possible outcomes of the Stonehill claims against the Saunders estate. The offer of proof also suggested that Perkin and Schwab would bolster their reports during testimony to address the "ascertainable with reasonable certainty standard", but such additional testimony on direct would not necessarily be allowed under Rule 143(g) and the Court's standing pretrial order. Respondent does not object to the estate's proffers for the limited purpose of determining whether the value of the Stonehill lawsuit was ascertainable with reasonable certainty and will be paid within the meaning of section 20.2053–1(b)(3), Estate Tax Regs., but reserves the right to raise objections and cross-examine the witnesses if the Court concludes that a trial is necessary.

## *Discussion*

Preliminarily we discuss a difference between the parties as to the procedural posture of this case. Despite the agreement of the parties that the issue before the Court would be submitted on the basis of the stipulated facts and the estate's offer of proof, the estate argues that respondent's position is akin to a motion to dismiss for failure to state a claim or a motion for summary judgment and that the estate is entitled to a trial on the issue of ascertainability. We reject that characterization and demand. The Court expressly disavowed during the initial discussion any suggestion that the issue could be decided on summary judgment. The suggestion of bifurcation of the issues for a preliminary determination based on stipulated facts and exhibits was made by the Court after reviewing the expert reports that had been submitted approximately 30 days prior to the trial. Those reports would constitute the direct testimony of the witnesses as to valuation of the Stonehill claim. See Rule 143(g). Our

decision will be based on applying the law to the stipulated facts and documents, not as a matter of pleading or summary judgment. See Rules 122, 149(b). But see *Marshall Naify Revocable Trust v. United States*, 106 AFTR 2d 2010–6236, 2010–2 USTC par. 60,603 (N.D. Cal. 2010), on appeal (9th Cir., Oct. 19, 2010), where judgment on the pleadings was rendered in favor of the Government on this issue.

The estate's counsel agreed to the bifurcation procedure as an accommodation to the logistics and anticipated expenses of trial where the valuation issues would be presented. On the record when the case was called in San Francisco for receipt of the stipulation, the estate's counsel recognized that the matter would be decided by applying the law to the stipulated facts and the estate's offer of proof and not by summary judgment. In a subsequent conference call, the possibility of abandoning the procedure was discussed but discarded. The estate's current position would render pointless the whole exercise of stipulating and briefing the "ascertainability of the claim" issue and our consideration of it in this Opinion. The estate agreed to the procedure, is not unfairly prejudiced by it, and is bound to it.

*Statute and Regulations*

Section 2001(a), as of the relevant dates of death in this case, imposes an estate tax on the taxable estate of a decedent, determined, in accordance with section 2051, after deductions provided for in sections 2053 through 2058. Section 2053(a) allows a deduction for claims against the estate that are allowable by the laws of the jurisdiction under which the estate is administered.

Section 20.2053–1(b)(3), Estate Tax Regs., as in effect for the respective dates of death of decedent in 2004 and Saunders in 2003 provided:

An item may be entered on the return for deduction though its exact amount is not then known, provided it is ascertainable with reasonable certainty, and will be paid. No deduction may be taken upon the basis of a vague or uncertain estimate. If the amount of a liability was not ascertainable at the time of final audit of the return by the district director and, as a consequence, it was not allowed as a deduction in the audit, and subsequently the amount of the liability is ascertained, relief may be sought by a petition to the Tax Court or a claim for refund as provided by sections 6213(a) and 6511, respectively.

Section 20.2053–4, Estate Tax Regs., provided:

The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death, whether or not then matured, and interest thereon which had accrued at the time of death. Only interest accrued at the date of the decedent's death is allowable even though the executor elects the alternate valuation method under section 2032. Only claims enforceable against the decedent's estate may be deducted. Except as otherwise provided in § 20.2053–5 with respect to pledges or subscriptions, Section 2053(c)(1)(A) provides that the allowance of a deduction for a claim founded upon a promise or agreement is limited to the extent that the liability was contracted bona fide and for an adequate and full consideration in money or money's worth. See § 20.2043–1. Liabilities imposed by law or arising out of torts are deductible.

For our purposes, the parties have assumed that the valuation date is the date of decedent's death, rather than the date of Saunders' death, because of the agreement closing the Saunders estate.

### *Lawsuits as Assets or as Contingent Liabilities*

The limitations on deduction of liabilities set forth in the regulations quoted above do not apply to the inclusion in a decedent's gross estate of claims in favor of the estate under section 2031. Thus there are many cases in which the value of claims in favor of an estate is established, including those the estate cited in the filed briefs. See *United States v. Simmons*, 346 F.2d 213 (5th Cir. 1965); *Bank of Cal., Natl. Association v. Commissioner*, 133 F.2d 428 (9th Cir. 1943), affg. in part and revg. in part *Estate of Barneson v. Commissioner*, a Memorandum Opinion of the Board of Tax Appeals dated May 27, 1941; *Estate of Curry v. Commissioner*, 74 T.C. 540 (1980); *Estate of Aldrich v. Commissioner*, T.C. Memo. 1983–543; *Rubenstein v. United States*, 826 F. Supp. 448 (S.D. Fla. 1993). As demonstrated in the expert reports of Schwab and McCann, there are recognized methods of valuing choses in action by assuming various outcomes, assigning probabilities to those outcomes, and quantifying the results. Respondent contends, however, that the same standards of reliability of valuation techniques for asset purposes do not apply to liabilities in view of the stricter provisions of the regulations under section 2053. In other words, a value may be determined for asset inclusion purposes that

does not satisfy the "ascertainable with reasonable certainty" standard for deduction purposes. It is essentially undisputed that postdeath events are not considered in valuing assets in an estate because of the rule stated in *Ithaca Trust Co. v. United States*, 279 U.S. 151, 155 (1929), that an estate "so far as may be is settled as of the date of * * * [the decedent's] death."

Many cases can also be found involving attempts to value claims against an estate. One matter on which courts appear to differ is the extent to which events subsequent to the date of death may be considered in determining the deductibility of a claim. See *Estate of O'Neal v. United States*, 258 F.3d 1265 (11th Cir. 2001); *Estate of McMorris v. Commissioner*, 243 F.3d 1254 (10th Cir. 2001), revg. T.C. Memo. 1999–82; *Estate of Smith v. Commissioner*, 198 F.3d 515 (5th Cir. 1999), revg. on this issue 108 T.C. 412 (1997); *Estate of Sachs v. Commissioner*, 856 F.2d 1158, 1160–1163 (8th Cir. 1988), affg. in part and revg. in part 88 T.C. 769 (1987); *Commissioner v. Estate of Shively*, 276 F.2d 372, 373–375 (2d Cir. 1960), revg. T.C. Memo. 1958–196; *Commissioner v. State St. Trust Co.*, 128 F.2d 618 (1st Cir. 1942), remanding *Estate of Grinnell v. Commissioner*, 44 B.T.A. 1286 (1941); *Jacobs v. Commissioner*, 34 F.2d 233, 234–235 (8th Cir. 1929), affg. 9 B.T.A. 636 (1927); *Estate of Kyle v. Commissioner*, 94 T.C. 829, 848–851 (1990); *Estate of Hagmann v. Commissioner*, 60 T.C. 465, 466–469 (1973), affd. 492 F.2d 796 (5th Cir. 1974).

Our decision in this case is appealable to the Court of Appeals for the Ninth Circuit, and thus respondent relies on *Propstra v. United States*, 680 F.2d 1248, 1253 (9th Cir. 1982) (stating that "The law is clear that post-death events are relevant when computing the deduction to be taken for disputed or contingent claims" (citing section 20.2053–1(b)(3), Estate Tax Regs.)), and *Estate of Van Horne v. Commissioner*, 78 T.C. 728, 735 (1982) (in which we concluded that we consider postdeath events in cases where the decedent's creditor has only a potential, unmatured, contingent, or contested claim that requires further action before it becomes a fixed obligation of the estate, but not where a claim is valid and fully enforceable on the date of death), affd. 720 F.2d 1114 (9th Cir. 1983). See *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971); see also *Estate of Shapiro v. United States*, 634 F.3d 1055 (9th Cir.

2011); *Marshall Naify Revocable Trust v. United States*, 106 AFTR 2d 2010–6236, 2010–2 USTC par. 60,603 (N.D. Cal. 2010) (discussing the precedential weight of *Propstra*), on appeal (9th Cir., Oct. 19, 2010). Respondent describes the combined effect of those cases as holding "if the claims were not certain and enforceable, but disputed or contingent, post-death events would be considered." The estate discounts the *Propstra* rationale as dicta.

In the discussions with counsel leading to submission of the preliminary issue discussed in this Opinion, the Court expressed an interest in avoiding the necessity of deciding whether subsequent events, particularly settlement of the Stonehill claim for $250,000, could be considered, referring to those cases cited above that reversed this Court and directed that postdeath events either be considered, *Estate of Sachs v. Commissioner*, *supra*, or not considered, *Estate of McMorris v. Commissioner*, *supra*; *Estate of Smith v. Commissioner*, *supra*. In *Estate of Van Horne v. Commissioner*, *supra* at 736–737, we observed that these cases "are not easily reconciled with one another, and at times it is like picking one's way through a minefield in seeking to find a completely consistent course of decision". Unfortunately, the difficulty has not diminished, and we maintain our position that reconciliation need not be undertaken here. We do not consider the subsequent settlement in our discussion of the question of whether the value of the Stonehill claim was ascertainable with reasonable certainty as of November 2004. We have addressed this dispute only to demonstrate that there is a difference between valuing claims in favor of an estate and allowing deductions for claims against an estate.

*Claims Ascertainable With Reasonable Certainty*

The estate cites *Estate of Smith v. Commissioner*, *supra*, *Estate of O'Neal v. United States*, *supra*, and *Estate of McMorris v. Commissioner*, *supra*, to argue that "disputed lawsuits can be ascertained with reasonable certainty". We agree with the comment of the District Court in *Marshall Naify Revocable Trust v. United States*, *supra* at 2010–6240 to 2010–6241, 2010–2 USTC par. 60,603, at 86,285–86,286, that

it cannot be that simply because one can assign a probability to any event and calculate a value accordingly, any and all claims are reasonably certain and susceptible to deduction. To so hold would read the regulatory restriction [section 20.2053–1, Estate Tax Regs.] out of existence. * * * The regulation * * * explicitly contemplates that some claims will be simply too uncertain to be taken as a deduction, regardless of the fact that it is always possible to come up with some estimate of a claim's value. [Fn. ref. omitted.]

Our review of the estate's expert reports, standing alone, convinces us the value of the Stonehill claim against the Saunders estate is too uncertain to be deducted as of November 2004.

Perkin vigorously and successfully resisted the Stonehill claim on behalf of the Saunders estate. In his August 30, 2005, letter, he discussed "the wide range of unknowns as of November 2003" (the date of Saunders' death) to arrive at a "substantial discount" of the $90 million face amount of the Stonehill complaints. He estimated the likelihood of Stonehill's attack on the Federal tax judgments as "uncertain but seem to range between twenty-five to fifty percent." He acknowledged that the probable range of jury damages awards would be from $1 to $90 million.

Perkin's report prepared in October 2009 provided greater detail about the Stonehill lawsuit and discussed the potential exposure of the Saunders estate compared to its total value. He assumed the worst in almost every instance. He reduced his estimate of value from $30 million to $25 million. His report is fraught with vague and uncertain guesstimates, without any objectively reliable discussion of the strength of the defense that he asserted in the Hawaii State court.

Schwab's report used recognized methodology to quantify the opinions that he was provided by the estate's counsel. His results, however, suffer from the deficiencies of the opinions on which he relied. Even so, his valuation was over $10 million less than that asserted initially by Perkin and the estate. He correctly described the liability as "contingent" and assumed the unresolved legal position that postdeath events could not be considered.

Bickerton's reports generalized about the probable analysis undertaken by the Stonehill estate lawyers, concluding that they would expect a 75-percent probability of prevailing before commencing a contingency fee case. He thus guessed

that the case would not be taken unless the plaintiff's lawyers "judged that the case had a value of at least $22.5 million after discounting by the risk of not prevailing."

Based on these reports presented by the estate for use at trial, the suggested values are $30 million, $25 million, $19.3 million, and $22.5 million—prima facie indications of the lack of reasonable certainty. None of the estate's experts opined, nor could they reasonably opine, that the $30 million claimed on the estate tax return or any specific lesser amount would be paid, as required by the applicable regulation. The stark differences between their reports and those of respondent's experts merely reinforce the uncertainties inherent in the process. The valuation methodologies are in sharp contrast to applying actuarial tables to enforceable claims, as approved in *Estate of Van Horne v. Commissioner*, 78 T.C. 728 (1982). In summary, stating and supporting a value is not equivalent to ascertaining a value with reasonable certainty. Neither the estate's experts nor their offer of proof satisfies the applicable legal standard.

For the foregoing reasons, we conclude that the Stonehill claim was not deductible as of the date of death of decedent. The amount actually paid during the administration of the estate may be deducted in accordance with section 20.2053–1(b)(3), Estate Tax Regs.

We have considered the other arguments of the parties. They do not affect our result for the reasons stated above.

*Decision will be entered under Rule 155.*